20-1499 American Clean Power Association Petitioner v. Federal Energy Regulatory Commission Mr. Tabak for the Petitioner, Ms. Pasella for the Respondent. Good morning. Good morning, Your Honors, may it please the Court, Gabriel Tabak on behalf of Petitioner. Your Honors, FERC's orders under review fail to pass muster under the Administrative Procedure Act for two principal reasons, which are closely related. First, the Commission has not squared its orders with its own precedent. And second, it made its decisions without substantial evidence. Both errors, independently and jointly, require vacature. First, these orders broke with FERC's precedent. Let me just interrupt you. Where you describe the substantial evidence argument, you put that in terms of FERC failing to follow its own precedent. That's what you said. You said, you said, you said, you say here that you say FERC's orders were unsupported by substantial evidence because they ignored evidence showing that this conflicted with FERC's prior precedent. So even your substantial evidence argument is in terms of conflicting with prior precedent. Isn't it? Your Honor, the substantial evidence argument does reference the past precedent. It also does, I believe, at pages 27 and 28 of our opening brief, or 27 through 29, expressly make clear that there were, there's a lack of evidence upon which these orders stand distinct from the precedent piece and traditionally failing to. What is that? Your Honor, the on the substantial evidence point, this is the notion that FERC accepted the concept of risk to transmission, owning utilities and retail customers from a default of an unsecured interconnection customer. But without any evidence that actually identified such a risk, and that's that's at pages 27 to 29 of our opening brief. You mean a risk of nonpayment. Is that what you're talking about? Yeah. Well, how do you find evidence of a risk of nonpayment? That's true. Anytime somebody has an obligation, there's always a risk of nonpayment. That's like your Honor. That's like asking for evidence of economics 101. Your Honor, in it, in the, in the orders, the, the commission indicates that it believed there was a risk. However, review of the, of what the commission is citing there simply goes to the unsupported assertions of both the system operator and the transmission owners in their, in their own filings before the commission. I mean, there's no actual indication that there, there has ever been a default from a generator who was unable to pay here. Why do you have to have evidence like that? I mean, as Judge Silberman said, it's sort of econ 101. I mean, why does FERC need evidence for the proposition that a defaulting generator, that the possibility of a default increases the risk to the transmission of it. I mean, I just don't, what kind of evidence would you put on would you get some expensive economics expert and have them testify to the obvious. Your Honor, the type of evidence that not, not wanting to presume what FERC might find if it were actually to develop a record on this point, but the types of evidence here could include any actual defaults in the past, as well as any near misses. The, the default provision also includes a cure provision. If there were indications that a generator had missed a payment, but been able to make good through the cure period in the facility service agreement, there's simply no evidence that there's ever been even one of those from the record in this case. And certainly not one that justifies the duplicative burden of the security and the default obligation on interconnecting generators in the region. All right, just so I understand, other than that substantial evidence argument, your whole case boils down to the proposition that FERC ignored its precedent, right? Didn't explain. That's what your case is all about, right? Yes, Your Honor. Okay, fine. Okay, so go ahead. Thank you, Your Honor. On the precedent point, the commission had previously declined to require security. Once upgrades to the transmission system were operational, and the generator was, was repaying the transmission owner under a facility service agreement for these operational facilities. You're referring to option one, right? Yes, Your Honor, that's in the option one context. And option one is a situation which FERC subsequently decided, quite reasonably, it seems to me, that it was dreadfully unfair to the generators, that the transmission owners were way overcharging. I won't go through the technical reasons, but it's clear. So the fact that FERC did not require security on that can be explained in terms of option one was unfair to the generators in the first place. Your Honor, for the point at which the facilities are operational, we would submit that they're, they're functionally identical as to the option one context and in the orders under review for it in both circumstances. But you're right. Excuse me, but I'm right, aren't I, that option one was regarded by FERC as unfair to the generators. Yes, Your Honor. So, it's not surprising, it's not surprising that they didn't require security. It's a complicated transaction whereby the transmission owner was paying, was having the generator pay for the upgrade and then the transmission owner would pay him back and then charge them for the return on the capital, which was outrageous. Yes, Your Honor, that's an accurate description of how the option one facility service agreement worked. However, at the point where the facilities became operational and the transmission owner had reimbursed the generator, in the option one context and here, the generator is obligated to use a facility service agreement to repay the transmission owner for that amount over the full term of the facility. I understand, but you're taking out one part of the option one, ignoring the fact that the option one was regarded subsequently by FERC as unfair to the generators. So, it's not surprising they wouldn't require security to be posted. It's a frail read for you to be relying on as inconsistent precedent. Your Honor, we'd submit that the unfairness to the generator here was not the decisive factor or the comparability that is most important between the option one context and in the orders under review. The issue here is whether having both a default provision and a security provision is duplicative. In the option one context, the commission found that security was unnecessary. I don't understand the argument that the default and the security provisions are duplicative. I don't get that at all. Again, I'm having trouble with your logic. Your Honor, the default provision is if you miss a payment, the whole debt is due immediately. But what's to guarantee that you'll pay? Suppose you're in bankruptcy. Several factors, Your Honor. The generator is extremely unlikely to default without the ability to pay in part because to get to this point with the upgrades operational, it has gone through a multi-year interconnection queue with numerous financial milestones along the way. It has gone through the generator interconnection agreement under which in the payment provisions here and not at issue before the court, there is security while the transmission owner is constructing the facilities for the full capital cost. And now these facilities are operational after sort of running the financial gauntlet for years. The generating facility is operational. The transmission facilities that the generator has paid for are operational. It is delivering power to the grid. And yes, should they miss a payment, the entire balance due that will be required under the default provision. The notion that a generator would be unable to pay is extremely unlikely. And one more factor, Your Honor, is that our members, the companies that develop these projects, are not in this business to develop a single project. They have a portfolio of projects under development at any one time. If they were to default without the ability to pay, they would become a completely implausible counterparty to transact with a buyer for their energy. The notion that they would default without ability to pay is extraordinarily unlikely here and is not demonstrated in the evidence. You know, counsel, if I rely on my previous banking experience, if you're right, that the prospect of refusing to pay or declining to pay is quite remote, then the cost of the letter of credit would be very low. So if you're right, that the cost, that the likelihood of default and or refusal to pay is remote, then your letter of credit will be cheap. The letter of credit still comes with real costs? Of course, but the cost will be much less insofar as you identify a low risk of nonpayment. Your Honor, multiplied out across the term of the facility service agreement and multiplied out across a portfolio of projects on a hypothetical $10 million upgrade that the generator is repaying the transmission owner for, the letter of credit for the security would still likely be in the six figures or more every year. Again, multiplied out over the term and across the portfolio. Did you put any of that evidence before FERC? I was looking and didn't see any signs of evidence where you talked about the impact on generators. Just references to a double burden, but no, I couldn't find any arguments about an actual impact, as in this would like deter generators from interconnecting. Did you put any such evidence in the record? And did you, did I miss it? Did you somewhere raise that as a problem? Your Honor, we raised this as a problem generically, but did not include the specific dollars associated with it. I don't mean generically, did you say this would, I guess this would cost money. We definitely made that point. Did you say it would deter generators from either developing or interconnecting? Your Honor, the issue is, I believe is less that it would deter generators from interconnecting and more that it takes capital out of the companies that are seeking to invest, making them unable to invest in incremental additional projects. Did you make that point? Did you make that point you just said to FERC? Yes, Your Honor, I believe so. Page 11 of our hearing request, we discussed the duplicative burden here. No, duplicative burden is not the same thing as we won't have resources to invest. Duplicative burden is just a complaint about what they're doing. And I understand your point on that. You've made that clearly. You just made another point about, you know, this has a deterrent on generators. It'll prevent further investment and development of generation. And had you made that argument and had FERC ignored it, that would have been something for you to complain about. But I didn't see that. Did you make that in your petition or rehearing this complaint about competing investment? Your Honor, I'm not certain on that, but I'm happy to respond on rebuttal if there's an appropriate pin site. Mr. Tabeck, you're almost out of time. And I want to take you back to your basic argument that FERC's decision here is inconsistent with White Oak 1 and 2, right? That's your argument. Am I oversimplifying this thing? As I read that case, FERC rejected the post construction security requirement because it wasn't in the tariff. They said it has post construction security requirement have an impact on rates. It has to be in the tariff. And that's why they rejected it. And here, by now, MISO has now put it in the tariff. So this is totally, and FERC explained that in its decision. Am I missing something? Your Honor, the notion that the inclusion in the tariff is the decisive factor elides an intervening step, which is that this is the 205 proceeding, the rate proceeding under the Federal Power Act, in which FERC accepted the facility service agreement into the tariff. The consistency with precedent or the ability to explain a break with precedent speaks directly to whether the inclusion in the tariff was itself just unreasonable here. Had there been an intervening proceeding in which the commission had accepted into the tariff and were merely applying it in these cases, I would agree that that might be an appropriate line of reasoning. However, the commission needs to demonstrate under 205 and this court's precedent that the acceptance in the tariff is itself just unreasonable. All right. Unless either of my colleagues have any questions, we'll hear from FERC.  No questions. Good morning, Your Honors. Beth Pasella for the commission. The commission found that the security provision was just unreasonable because it would ensure that the transmission owner and its transmission customers would not have to bear the cost of network upgrades that were built for interconnection customers. That provided no benefit to these other transmission service customers. And so that's why the commission found it was just unreasonable. And there didn't need to be evidence required for this well-established general principle. For example, in Ameren, which is, you know, this court's opinion in 880 F3rd 571, at 577 and 579 recognized that having to provide security to backstop a payment obligation like this is essentially a given. There, the court rejected the commission's notion that requiring security increased costs to interconnection customers in the context of, excuse me, in the context of initial transmission owner, initial funding, because if the generator found another source of capital to cover the cost of the upgrade, the court said, we can't imagine that the generator wouldn't have to provide the same kind of security, even if they paid for the upgrade themselves initially. So there's really no question that security is appropriate in a circumstance like this, because otherwise there is a risk, even with default as the commission found with a default provision. Was there any, was there any evidence of a real world risk? I understand the economic theory, but it wasn't like this interconnection process was novel. FERC had decades and decades of experience. I didn't see FERC talk about any concern, any problem that had arisen. I know the intervener in support of FERC says sort of elliptically on page 21 that these defaults are, quote, not unusual, end quote, and said they put evidence in, but I couldn't find it. Did FERC have evidence that this had ever happened even once? Let me say this, Your Honor, in response to the FERC intervener's point that you just said on page 21, that it's not uncommon that, excuse me, that it's not uncommon. Not unusual. That it's not unusual to have non-payment problems. That is unrebutted in the reply briefs. They never said we presented anything, we argued to the commission that it was uncommon, that those arguments were never raised to the commission. The commission actually did a very good job in these orders answering the matter. The question I have, why didn't, to decide that this cost, I mean, it's going to be a cost, it's going to be a burden on generators, that's also economics 101. And so, did they, why didn't they need to at least know that there was something broken before they fix it, there was actually a real world problem given that, excuse me, given just the dynamics of the situation. This isn't people getting mortgages on homes. My first point, again, Your Honor, is that it is innately a problem. Because again, the default provision will require the interconnection customer to pay now all of the costs. I'm asking whether, well, I understand theoretically that it's, there's always that risk. My question is, was there no, it sounds like there was no evidence and to be clear, they didn't, I don't know if they put in evidence, it doesn't sound like it, that this never happens. They never even raised the notion that this never happens, Your Honor. I do understand that, so that's a separate question, is it okay for FERC to find that it's just unreasonable without finding, when it is definitely adding increased costs, increased burden on generation without finding some need for it, actual need for it, real world need for it? Your Honor, in the very specific circumstance of FERC, where we have a rehearing requirement in our statute, section 313B, 16 U.S.C. 825L, that matters have to be specifically raised to the commission on rehearing in order for the court to have jurisdiction to address them. I apologize, it's just not before you, it just isn't. You don't have the rehearing request in the joint appendix, and I apologize, you only have one page of that regarding double burden, I believe. We didn't, I'd be happy to submit it to you, it's very short, it does not raise these claims here. What it raises is, in the rehearing request. Right, the rehearing order describes, the rehearing order describes the arguments, and I'm, they haven't said that's inaccurate, so we can take that. It's not inaccurate, and there's nothing there, so the commission cannot, literally this court can't, you just can't remand the commission on that point, even theoretically. I'm not asking you to remand, I'm just asking sort of the legal question, do they just need to, is it true that they just, to add more costs, they don't need a reason for it, as long as someone says I'd like to add this additional cost, and it has an economic theory, I'm not disputing that they gave a reason here, but there was no evidence for it, and it's, like I said, it's also economics 101, that increased costs, you know, can deter generation, can impede development and investment elsewhere. I guess I would turn to the, in the record, we have the system operators filing at JA7 and JA14, the system operators talking about how this is essential to ensure that the interconnection customer pays for this, rather than the transmission customers. And you know, that's how it automatically happens. No, I get it, absolutely. If someone defaults. Yes, absolutely. Right, so there's no question that there's real harm potential, based on this record, on page JA14. That's my question. That's my question. In response to the system operators claim that this is critical, and it's essential, we have nothing in the record, no claim ever. I understand, but you didn't have, you had them saying that, but they didn't give you evidence that there was actually a problem out there. So the examples that are provided by, in the record, and by, in the reply brief, excuse me, excuse me, in the FERC intervener brief at 21, are insolvency. And again, the FERC intervener said in its brief, this is not an unusual scenario, and there's no rebuttal to that. My question, though, is did they provide, they didn't provide that information to you? They provided nothing to FERC about this. Right, okay. It was never raised by petitioners. Neither side provided, neither side. Nothing, other than the basic economic 101 concept of default is just not enough. And let me say, the commission's precedent never said that default was enough. If you look at White Oak 1, for example, at paragraph 39, which the commission cites in its orders, towards the end of paragraph 39, the commission says there, quote, whether or not the default provision addresses the risk to native load is not an issue before us. And again, that's because the commission was deciding those cases based solely on the fact that the filed rate doctrine was not satisfied there. The tariff at the time did not include the requirement that security be provided post-construction. And that's actually when the network upgrade charges are paid. So there's no payment for these facilities until the post-construction period. So default happens either, and the other example that the intervener, FERC intervener provided, and it provided it below as well, is that if an interconnection customer's generating facility never achieves commercial operation. So they request this interconnection, and that whole process happens, and it's built, but their generating facility never gets online, and they can just walk away from it. Those White Oak cases were just dealt with the tariff that existed prior to FERC having decided that option one was unfair and unreasonable. No, it actually, Your Honor, it happened after FERC decided. Oh, I know that, but they were resilient. They were under that tariff. That's exactly right. They were under the old tariff. That's right, Your Honor. There's another point, if I understand. It isn't necessary for all generators to have a letter of credit in. If they're owned by another corporation, the other corporation can issue a guarantee.  Your Honor, there's three possibilities of how they can do it, and it's, they can do it through a letter of, for example, it says at JA23 in Section 4A, they can do, for example, a letter of credit, a surety bond, or parent guarantee. Well, parent guarantee doesn't cause them any interest or anything like that. That's right. That's right. Can I ask you just one other thing, just as we think about this? How does, when you have all this security at every stage, how does this not present the, another version of the problem from Ameren that the transmission owner is not having, facing any risk at the end of the day? It's getting all benefit and no risk. The transmission owner here has initially funded, so they have all the risks during construction. They have security then too, right? They have security, but that's just, that security is to ensure that the future payments, reimbursing them are paid. That's not security covering the construction. You know what I'm saying? I thought, all right, let me tell you what I thought, and then you can tell me what I'm wrong, because I'm obviously missing something. I thought there's security during the construction period. There is. And I assumed that was to ensure that money would come to recoup the construction costs. That's true, but that doesn't happen until later. So that security just sits there. And, and, and once the, because the network upgrade charges aren't done until the... I see. And so then you continue it through the process just to make sure you get them until you're done. That is just continuity. They used to write it. You know, it was kind of silly that the tariff before didn't include it. And I think the commission in the White Oak Orders was probably saying to parties, if you want security, you've got to include it in the tariff. So include it in the tariff. And that's what happened here. But it had to be in the tariff. And that's just a very strict requirement that FERC faces under the statute. But interestingly enough, the security does not cover the profit. That's right, Your Honor. It's interesting. Arguably, it could have included the profit, but that would be hard to calculate, I suppose. But in any event, it's more merciful for the generators than it might theoretically have been. That's right. And the proposal... It covers just actual costs. That's exactly right. Not the profit on the cost. And the proposals in the earlier cases did include the return on equity part. Yes, yes, I wrote the opinion. I know. And I'm a great believer in profit. Absolutely. So it's that and the possibility to roll over the security so that there wouldn't be additional transactional costs and the opportunity to decrease... All of those things are in favor of the generator. It's all of a balance. Protecting the commission, taking its obligation to protect consumers, these entities, the transmission customers for whom these are not built, should not have to pay this. And that's really what this case is about. If the court doesn't have anything... Anything else, Judge Silberman? No question. No question. No question. Thank you. Thank you, Your Honor. So, Mr. Tabak, you were out of time, but you can have two minutes. Thank you, Your Honor. I would just quickly note here on rebuttal that in terms of the evidence that Judge Millett was discussing with FERC counsel, again, this is a Section 205 proceeding where the burden is on the proponent of the rate to carry the burden of proof. The commission, as Judge Millett noted, cited to no actual evidence, which particularly in light of the inconsistency with the Option 1 cases, leaves no real trail of its economic logic here of why it believed that the logic of potential risk to transmission owners from a generator default was substantial here, but did not believe it was the case in the Option 1 cases, which did not evince any concern over that particular point. Mr. Tabak, in the Option 1 cases, FERC didn't address the question of whether a post-construction security requirement would be just and reasonable if included in a tariff. In those cases, it wasn't in the tariff. So, FERC never addressed that question. Yes, Your Honor, that's absolutely true, but FERC also considered the precise point of risk to the transmission owner and evinced absolutely no concern in the Option 1 orders. FERC had options at its disposal. Would you point us to that language, please? That, I believe, is at the 2015 White Oak case, 152 FERC. My notes say FERC expressly said it was not addressing the question. Yes. FERC said that whether the default provision addresses a risk to native load is an issue that is not before them. However, had the Commission believed there was a real risk, it is not uncommon for FERC orders to include admonitions, concern, require further briefing. Again, the issue was squarely raised, and even if FERC believed it was obligated to follow the tariff in place for those orders, when faced with a new argument, the Commission has options to explore whether there's merit to that, to view whether it needs to be altered in any future facility service agreement. There's no indication of even concern in the White Oak orders, and now we have a very sparse trail on what theory the Commission found persuasive in the orders under review. Why is it surprising that there's no concern, since in White Oak, the problem was a file rate doctrine problem? It just wasn't in the tariff, so there wasn't any reason for the FERC to express itself or raise concern about post security. I don't see why that's a mystery. Your Honor, while I understand your point regarding why FERC wouldn't have expressed it there, I think that that really speaks to the need for FERC to act clearly in the orders under review, which is not to explain why when generators and transmission owners were similarly situated after the facilities are under construction and the transmission owner is being repaid under the facility service agreement, why they would be treated differently here. We simply don't have that explanation, other than FERC's assertion that it found the risk of default to be something that needed to be accounted for. But again, as Judge Millett noted, there's simply no actual evidence to support that. An argument you haven't made. Right. That's a problem. Your Honor, while I'll agree that we did, I will certainly concede we did not make that argument in our brief. Again, this is a 205 proceeding. The commission's orders need to rest on substantial evidence and there's no evidence of risk here, again, in light, which is concerning in light of the inconsistency with FERC's own precedent. Okay. Judge Millett, Judge Silverman, anything else? No. Okay, thank you. The case is submitted.
judges: Tatel, Millett, Silberman